1   **MUSICK, PEELER & GARRETT LLP**
        ATTORNEYS AT LAW
2        2801 TOWNSGATE ROAD, SUITE 200
        WESTLAKE VILLAGE, CALIFORNIA 91361
            TELEPHONE: 805-418-3103
3             FACSIMILE 805-418-3101

4   Gregory J. Patterson (State Bar No. 136665)
    g.patterson@mpglaw.com

5   Attorneys for Defendant Bowman Plating Company, Inc.

6

7

8                  **UNITED STATES DISTRICT COURT**

9              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11   UNITED STATES OF AMERICA,              CR No. 12-00479

12              Plaintiff,                   **NOTICE OF FILING BOARD OF DIRECTORS' RESOLUTION**
13        vs.                                **APPROVING PLEA AGREEMENT; DECLARATION OF GREGORY J.**
14   BOWMAN PLATING COMPANY, INC.,           **PATTERSON IN SUPPORT THEREOF**

15              Defendant.

16

17   TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

18        PLEASE TAKE NOTICE Defendant Bowman Plating Company, Inc. ("Bowman") hereby

19   files a true and correct copy of the Certified Resolution of the Board of Directors of Bowman

20   approving and accepting the terms of the Plea Agreement with the United States Attorney in the

21   form attached as Exhibit A to the Certified Resolution.  This Resolution was adopted by the Board

22   of Directors on May 9, 2012.

23

24   DATED: May 24, 2012                MUSICK, PEELER & GARRETT LLP

25

26                                 By: _____
27                                      Gregory J. Patterson
                                        Attorneys for Petitioner Colleen Reid
28

794560.1                                  1

## DECLARATION OF GREGORY J. PATTERSON

I, Gregory J. Patterson, declare as follows:

1.     I am an attorney duly admitted to practice before all the courts in the State of California and the United States District Court for the Central District of California. I am a partner with MUSICK, PEELER & GARRETT LLP, attorneys of record for Bowman Plating Company, Inc. I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify thereto.

2.     I am one of the attorneys for Bowman Plating Company, Inc. in this matter. I participated by telephone in a meeting of the Board of Directors of Bowman Plating Company, Inc. on May 9, 2012. At that time, the Board of Directors adopted a Resolution accepting the terms of the Plea Agreement, attached to the Certified Resolution as Exhibit A.

3.     A true and correct copy of the Certified Resolution and Plea Agreement is attached to this Declaration.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed May 24, 2012, at Westlake Village, California.

_____
Gregory J. Patterson

794560.1

2

NOTICE OF FILING BOARD OF DIRECTORS' RESOLUTION APPROVING PLEA AGREEMENT;
DECLARATION OF GREGORY J. PATTERSON IN SUPPORT THEREOF

## CERTIFIED RESOLUTIONS

I, Rashel Esfandi, Secretary of BOWMAN PLATING CO., INC., a California corporation, do hereby certify that the following is a true and correct copy of resolutions adopted by the Board of Directors of the corporation at a Regular Meeting of the Board of Directors held May 9, 2012; that the originals thereof are contained in the Minute Book of the corporation; and that such resolutions are in full force and effect and have not been altered, amended, modified or revoked:

Approval of Plea Agreement

WHEREAS, special counsel for the Corporation has negotiated a Plea Agreement proposed to be entered into between the Corporation and the United States Attorney, and a copy of such Plea Agreement is attached to these resolutions as Exhibit "A"; and

WHEREAS, the Plea Agreement requires, among other things, that the Corporation's Board of Directors execute a resolution accepting the terms of the Plea Agreement; and

WHEREAS, also pursuant to the terms of the Plea Agreement, the Corporation is required to cause an officer of the Corporation to enter a plea of guilty and to appear as ordered for all court appearances, pay any ordered fines within 90 days of sentencing, and obey any other ongoing court order in the matter; and

WHEREAS, the Corporation is required to pay a special $1,200 assessment at or before sentencing; and

WHEREAS, the Plea Agreement requires the Corporation to abide by all sentencing stipulations contained therein and to adopt and implement a Code of Ethics for the periods and on the terms specifically set forth in the Plea Agreement; and

WHEREAS, it is deemed to be in the best interests of the Corporation and its Shareholders to accept the terms of the Plea Agreement;

NOW, THEREFORE, BE IT RESOLVED, this Corporation accepts the terms of the Plea Agreement with the United States Attorney in the form attached hereto as Exhibit "A."

RESOLVED FURTHER, that Mac Esfandi, President of the Corporation, is hereby authorized and directed for and on behalf of the Corporation to comply with all of the requirements of the Plea Agreement, including, but not limited to (i) entering a plea of guilty on behalf of the Corporation, (ii) causing the payment of the special assessment at or before the time of sentencing, and (iii) appearing as ordered for all court appearances, paying any ordered fines within 90 days of sentencing, and obeying any other ongoing court order.

5 9 12
BN 11549668v1

3

RESOLVED FURTHER, that the Corporation will adopt and implement the Code of Ethics required pursuant to the Plea Agreement, and the officers of this Corporation are hereby authorized and directed to take any and all actions which they determine to be necessary and advisable in connection with the Code of Ethics.

RESOLVED FURTHER, that the officers of the Corporation are further authorized and directed to take any and all other actions and to execute any and all documents which they determine to be necessary and advisable in order to comply with the Corporation's obligations under the Plea Agreement.

IN WITNESS WHEREOF, I have set my hand this 9th day of May, 2012.

Rashel Esfandi,
Secretary of Bowman Plating Co., Inc.

5 9 12
BN 11549668v1

4

1  ANDRÉ BIROTTE, JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   DANIEL J. O'BRIEN (CA Bar Number 141720)
4  Assistant United States Attorneys
   Public Corruption and Civil Rights Section
5       1300 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-2468
7       Facsimile: (213) 894-6436
        Email: daniel.obrien@usdoj.gov
8
                    UNITED STATES DISTRICT COURT
9
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
11  UNITED STATES OF AMERICA,        ) CR No. 12-
                                     )
12                Plaintiff,         ) PLEA AGREEMENT
                                     )
13           v.                      )
                                     )
14  BOWMAN PLATING COMPANY, INC.,    )
                                     )
15                Defendant.         )
                                     )
16  _____ )
                                     )
17
18       1.   This constitutes the plea agreement between Bowman

19  Plating Company, Inc. ("defendant") and the United States

20  Attorney's Office for the Central District of California ("the

21  USAO") in the above-captioned case.   This agreement is limited to

22  the USAO and cannot bind any other federal, state, or local

23  prosecuting, administrative, or regulatory authorities.

24                              PLEA

25       2.   Defendant gives up the right to indictment by a grand

26  jury and agrees to plead guilty to a three-count information in

27  the form attached to this agreement or a substantially similar

28  form.

## NATURE OF THE OFFENSE

3.   In order for defendant to be guilty of the counts brought in the Information, which charge violations of Title 18, United States Code, Section 1001, the following must be true:

a.   First, the defendant, through its agent(s), made a statement or had a duty to disclose information;

b.   Second, the statement was false, or there were facts amounting to concealment;

c.   Third, the agent(s) made the statement or concealed facts knowingly and willfully;

d.   Fourth, the statement or concealed information concerned a matter within the jurisdiction of a government agency, namely the United States Navy and the Federal Aviation Administration ("FAA");

e.   Fifth, the statements or concealed facts were material, in that they could have influenced the government agencies' decisions or activities;

b.   Sixth, the agent(s) acted within the scope of his/her/their authority or apparent authority; and

c.   Seventh, the intent of the agent(s) was to benefit the defendant.

4.   Defendant admits that it is, in fact, guilty of the offenses charged in the Information.

## PENALTIES

5.   The statutory maximum sentence that the Court can impose for each violation of Title 18, United States Code, Section 1001 is: 5 years probation; a fine of $500,000 or twice the gross gain or gross loss resulting from the offense,

2

1  whichever is greatest; and a mandatory special assessment of
2  $400.

3                           FACTUAL BASIS

4       6.    Defendant and the USAO agree and stipulate to the
5  statement of facts provided below.  This statement of facts
6  includes facts sufficient to support a plea of guilty to the
7  charge described in this agreement and to establish the
8  sentencing guideline factors set forth in paragraph 9 below.  It
9  is not meant to be a complete recitation of all facts relevant to
10 the underlying criminal conduct or all facts known to defendant
11 that relate to that conduct.

12 Background

13      Bowman Plating Company, Inc. ("Bowman") is a chemical
14 processing company located in Compton, California that performs
15 finishing processes such as anodizing, plating, spray painting,
16 chemical film, barrel finishing, chemical cleaning, and blasting
17 for various metals and alloys.  Bowman's customers consist of
18 various manufacturers of aircraft parts in the civilian and
19 military aircraft industry.

20      In order to verify compliance with processing standards,
21 customer purchase orders received by Bowman typically require a
22 certificate of conformance ("COC") whereby Bowman certifies
23 compliance with certain military or commercial specifications.
24 These specifications typically require the adherence to certain
25 testing protocols to ensure product reliability.

26      Customer purchase orders also typically require that Bowman
27 maintain documentation that insures the traceability of every
28 item processed.  In industry practice, a production traveler

                                3

1  ("traveler") is a document that maintains traceability by
2  recording each process, test, and inspection to which a specific
3  item has been subjected.
4  Audits by Boeing
5      On June 9, 2003, The Boeing Company ("Boeing") conducted an
6  Annual Process Audit with respect to Bowman, and as a result,
7  issued Supplier Evaluation Report ("SER") 2T13-20030612-062550A
8  on June 12, 2003.  In the SER, the Boeing auditor documented a
9  number of process irregularities including "Repeated failures ...
10 of monthly tests, from 'outside' labs, were received.  The
11 records (lab test results), presented to me for review, only
12 contained the 'acceptable' test results.  I learned the initial
13 tests that were submitted had failed.  The 'failed' test records
14 were kept in another location and not presented until I requested
15 them.  The 'passed' retest results do not represent the process
16 conditions that existed at the time the 'failed' tests were
17 processed."
18     The auditor stated that Bowman's Quality Procedure Manual
19 (QP #13) represents that "Quality Assurance gives prompt (within
20 72 hours) notification to the customer when non-conformity is
21 discovered in Bowman's processes or products that may affect
22 product already delivered.  Bowman Plating never notified their
23 customers of the reported failures.'"
24     In response to the SER and the possibility of suspension of
25 contracting privileges, Bowman issued a disclosure letter to
26 Boeing on June 14, 2003, stating there were process non-
27 conformances for salt spray testing and other test procedures.
28 On June 16, 2003, Bowman issued a corrective action report

4

1  stating, that with respect to the repeated failures of monthly
2  tests from outside labs, Bowman's Director of Quality "failed to
3  follow through with internal procedures which requires an
4  immediate halt of affected process lines, implementation of
5  corrective action, and a reprocessing of acceptable test
6  specimens prior to the re-start of processing as well as,
7  concomitant disclosure to customers."  The report stated that as
8  part of Bowman's corrective actions, its Director of Quality had
9  been terminated, that disclosure letters were issued to
10 potentially affected customers, that record keeping would be
11 altered to include the filing of test reports by tank and
12 specification designations, regardless if the reports were
13 considered acceptable or nonconforming, and the President of
14 Bowman would review the testing results for no less than 90 days
15 to ensure testing was being controlled according to Bowman
16 Quality Instruction ("QI") 520.
17     Based upon Bowman's implementation of these corrective
18 measures, Boeing continued to engage in business with Bowman.
19 Bowman Quality Instruction 520
20     Bowman QI 520, Submitting of Periodic Testing Samples, sets
21 forth applicable processing and testing procedures for specimen
22 panels, that is sample pieces of metal that undergo the same
23 procedures as the processed parts, and states, in part:
24     "2.3  Processing of Test Specimens:  Testing specimens shall
25 be processed in the first week of the month, time permitting.
26 Test specimens shall be processed in the same manner, and when
27 possible, with actual production loads.  Processing of testing
28 specimens shall be recorded on shop travelers which shall show

5

the tanks the specimens were processed in, variable data involved in the processing, as well as processing personnel. . ."

"2.3.4.3  For external testing, logs shall record the date specimens were sent to outside testing agency."

"2.6 Failures:  Failure of testing specimens shall be controlled as follows.  Upon notification of processing failures, the processing of parts to the affected specification shall halt immediately.  Quality personnel shall review the nonconforming specimens to determine if the failure report is valid.  In the event that Quality determines that the evaluation of the panel is incorrect, specimens may be sent to an outside testing agency for evaluation to the same criteria.  This second testing agency must be separate from the original.  Quality Assurance shall begin the process of performing corrective action as outlined in QP#14 and QI 506.  Quality shall gather up all information and personnel required to effectively implement corrective and preventative action."

"2.6.4  Personnel shall be delegated to determine which customers, if any, may have been affected by the failure. Letters of disclosure shall be prepared and include, where practical, all affected hardware shipped to the customer since the last acceptable test result was obtained.  These letters shall be sent to customers in a timely manner as dictated by the Quality Manager."

"2.6.4.1  A copy of the letter of disclosure shall be maintained with the nonconforming certification in the testing file.  After the cause(s) of the test specimen failure has been determined, a new set of specimens shall be processed and

6

1  submitted to the same testing agency (in-house or outside testing

2  laboratory) for verification of corrective action.  The Quality

3  Manager has the sole authority to release "Retest" specimens."

4      "2.6.7  Only after reviewing acceptable results for the

5  corrected process, from the outside laboratory and approval from

6  Quality shall production of that process to the specification in

7  question be continued."

8  Repeated Specimen Panel Test Failures

9      Bowman retained the services of outside testing agencies,

10  Anachem Laboratories ("Anachem") and Durkee Testing Laboratories,

11  Inc. ("Durkee"), to test and inspect, on a monthly basis,

12  specimen panels prepared in connection with the processing of

13  items for Bowman's customers.  During the period September 9,

14  2003 through May 31, 2007, Anachem and Durkee reported to Bowman

15  16 test failures for the following specimen panels:

| Date | Rpt Number | Anachem Test Description | Process/Spec | Bowman Specimen ID |
|---|---|---|---|---|
| 9/9/2003 | A90675 | Paint Adhesion per DMS 1786 | Chem Film/DPS 9.45 | Item #212 |
| 9/22/2003 | 7610H | Paint Adhesion Test impact | Chem Film/DPS 9.45 | Tank 610; Item #214 |
| 9/25/2003 | A90923 | Paint Adhesion Test impact | Chem Film/PS 13202 P | Tank 610; Item #214 |
| 9/25/2003 | A90923 | Paint Adhesion per DMS 1786 | Chem Film/DPS 9.45 | Tank 610; Item #212 |
| 10/10/2003 | A91194 | Taber Abrasion per PS13208- Max wear 1.5 - mg/1000 cycles | Hard Anodize/PS 13208 Rev T | Tank 601; Item #267 |
| 10/10/2003 | A91194 | Taber Abrasion IAW Fed-Std 141, meth 6192.1 Max wear 40-mg/1000 cycles | Hard Anodize | Tank 601; Item #270 |

28

7

| | | | | |
|---|---|---|---|---|
| 10/10/2003 | A91194 | Taber Abrasion Resistance per C-445, Ty II, Cl 1 Max wear 0.001-mg/1000 cycles | Hard Anodize/DPS 11.04 | Tank 601; Item #285 |
| 10/13/2003 | A91206 | Paint Adhesion Test-impact | Chem Film/PS 13202 P | Tank 610; Item #214 |
| 10/31/2003 | A91481 | Taber Abrasion Max wear 3.5 - mg/1000 cycles | Hard Anodize/AMS-A-8625, Ty III | Tank 602; Item #288 |
| 11/19/2003 | A91723 | Paint Adhesion per DMS 1786L | Chromic Acid Anodize/DPS 11.01 & PS 13201 | Tank 301/321; Item #80 |
| 8/3/2005 | B11440 | Notched sustained load test per ASTM F519-05 | Cadmium Plate/AMS-QQ-P-416B | Tank 102; Item #5, Samples #HF1080-HF1083 |
| 12/23/2005 | B13873 | Salt Spray (FOG) Test per ASTM B 117 | Clear Chem Film/P55004 & P5611 Ty 1 | Panels #75-1, 75-2, 75-3, 75-4 |
| 1/17/2006 | B14155 | Salt Spray (FOG) Test per ASTM B 117-03 | Chem Film/P55004 & P56011 Ty 1 | Panels #75-1, 75-2, 75-3, 75-4, 5 |
| 2/24/2006 | B14861 | Salt Spray (FOG) Test per ASTM B 117-03 | Chromic Anodize/Mil-A- 8625F1 Cl 1 & BAC 5019T Cl 3 & PS 13201 AH Ty I, Cl 1 | Panels #24-1, 24-2, 24-3, 24-4, 5 |
| 3/24/2006 | B15348 | Salt Spray (FOG) Test per ASTM B 117-03 | Chem Film per Mil-C-5541E Cl 1A & P5601 | Item #195, Panels #1-5 |
| 5/31/2007 | B23860 | Notched sustained load test per ASTM F519-05 | Manganese Phosphate/Mil-DTL-16232G Ty M, Cl 2 | Tank 149A; Item #29, Four Notched Bars |

Non-Disclosures

Bowman shipped parts with COCs verifying that the parts had met the requirements of applicable specifications while outside laboratory analysis was pending. Subsequently, agents of Bowman became aware of the 16 test failures and that the associated industry specifications had not been met. Despite this

8

knowledge, these agents willfully determined not to notify any of the potentially affected customers of the subsequent test failures.

Anachem Test Report #B15348

As an example, on March 16, 2006, Bowman delivered to Anachem specimen panels that accompanied items subjected to chemical film processes at Bowman.  On March 24, 2006, Anachem issued to Bowman test report #B15348 documenting the failure of salt spray testing for these specimen panels.  The report noted that four out of five panels exhibited pinpoint pits, one in excess of those deemed acceptable under the military specification MIL-C-5541, and that there was corrosion of basis metal.

Military Specification for Chemical Conversion Coating

Chemical film coating, also known as chemical conversion coating, is typically used to provide maximum corrosion resistance to aluminum alloy parts.  The coating also provides a surface having better adhesion, as a base for paint or other organic finishes.

The military specification related to the use of chemical film is MIL-C-5541E, Chemical Conversion Coatings on Aluminum and Aluminum Alloys, issued on November 30, 1990.  This military specification is typically integrated into purchase orders issued by manufacturers to chemical processing companies such as Bowman. The specification states in part:

Paragraph "3.6   Corrosion resistance properties.  At the end of 168 hours exposure to the 5 percent salt spray test specified in 4.5.1, specimen panels (see 4.3.3) treated with the

9

1  applicable class of coating shall meet all of the following

2  corrosion resistance requirements.

3       No more than 5 isolated spots or pits (see 6.7), none larger

4  than 0.031 inches in diameter, per specimen panel ...

5       No more than 15 isolated spots or pits, none larger than

6  0.031 inches in diameter, on the combined surface area of all

7  five specimen panels subjected to the salt spray test."

8       Paragraph "4.1.1   <u>Responsibility for compliance</u>   All items

9  must meet all requirements of Section 3.  The inspection set

10  forth in this specification shall become a part of the

11  contractor's overall inspection system or quality program."

12       Paragraph "4.3.3   <u>Process control specimen panels</u>   Specimen

13  panels used for process control testing shall be 3 inches in

14  width, 10 inches in length, with a minimum 0.020 inch nominal

15  thickness.  The specimen panels shall be processed with the

16  hardware during an actual production run ..."

17       Paragraph "4.3.4   <u>Failure</u>   Failure to conform to any of

18  the process control requirements ... shall result in immediate

19  halt of production.  The reason for failure shall be determined

20  and corrected before production resumes.  All traceable and

21  retrievable work from the time the failed process control

22  specimens were conversion coated to the time when the failure was

23  determined shall be rejected, unless the contractor can

24  demonstrate that the items under review can meet the requirements

25  of this specification.  Unless otherwise specified, parts which

26  have been painted or incorporated into an assembly shall not be

27  considered retrievable."

28       Paragraph "4.5.1   <u>Corrosion resistance test</u>   Five specimen

10

panels prepared in accordance with paragraph 4.3.3 shall be used for corrosion resistance testing.  After the coating application, the specimen panels shall be dried at 60-100°F for 24 hours.  The panels shall then be subjected to a 5 percent salt spray test in accordance with ASTM B117 for 168 hours, except that the significant surface shall be inclined 6 degrees from the vertical.  After exposure, test pieces shall be cleaned in running water, not warmer than 100°F, blown with clean, dry unheated air, and visually examined for conformance with paragraph 3.6.

<u>Customers Potentially Affected By Anachem Test Report B15348</u>

Bowman did not maintain a traveler or any other traceability documentation with respect to the failed specimen panels referenced in Anachem test report B15348.  The following thirty-one customers, who had issued 89 purchase orders for chemical film processing by Bowman during the period February 24, 2006, the date of the previous Anachem test report, through March 24, 2006, the date of Anachem test report #B15348, were potentially affected by the failed test results:

| Inv. # | Customer Name | PO Date | Part # |
|--------|---------------|---------|--------|
| 284527 | A.M.S.I. | 3/9/06 | 123B92623-23 |
| 284925 | A.M.S.I. | 3/14/06 | 123B53072-317 |
| 284926 | A.M.S.I. | 3/14/06 | 123B53072-318 |
| 285637 | A.M.S.I. | 3/22/06 | 123B92031-45 |
| 285690 | A.M.S.I. | 3/22/06 | 65B04337-134 |
| 284391 | A.M.S.I. | 3/8/06 | 35-8642-54 |
| 285672 | A.M.S.I. | 3/22/06 | 35-8648-24 |
| 285680 | A.M.S.I. | 3/22/06 | 35-8648-25 |
| 285927 | A.M.S.I. | 3/24/06 | 35-8642-53 |
| 285929 | A.M.S.I. | 3/24/06 | 35-8642-55 |
| 285931 | A.M.S.I. | 3/24/06 | 35-8642-61 |
| 285933 | A.M.S.I. | 3/24/06 | 35-8642-56 |
| 284598 | Ace Clearwater | 3/10/06 | 1211095-106 |
| 284342 | Ace Clearwater | 3/8/06 | 1211095-104 |
| 284491 | Ace Clearwater | 3/9/06 | RQ541-2 |
| 284497 | Ace Clearwater | 3/9/06 | 20L199-79 |

11

| | | | | |
|---|---|---|---|---|
| 1 | 284593 | Ace Clearwater | 3/10/06 | 5HA45551-101 |
| | 284675 | Ace Clearwater | 3/10/06 | 5HA45555-101 |
| 2 | 285537 | Ace Clearwater | 3/21/06 | 5HA45550-109 |
| | 285787 | Ace Clearwater | 3/23/06 | 5HA45551-101 |
| 3 | 284443 | Acromil Corporation | 3/9/06 | 42A1011380-5003 |
| | 284961 | Acromil Corporation | 3/15/06 | 5HM40325-159 |
| 4 | 285106 | Acromil Corporation | 3/16/06 | 25G3166211-005 |
| | 285246 | Aircraft Stamping Co | 3/17/06 | 1D60880-3 |
| 5 | 285248 | Aircraft Stamping Co | 3/17/06 | 1D60880-5 |
| | 285022 | All Pro Precision | 3/15/06 | 1D71151-530 |
| 6 | 284392 | All Pro Precision | 3/8/06 | 1636374 |
| | 284788 | All Pro Precision | 3/13/06 | 204-30687-57 |
| 7 | 285203 | All Pro Precision | 3/17/06 | 1673482, 1673636 |
| | 285888 | Arnold Engineering | 3/24/06 | 130SKAB26015-1, |
| 8 | | | | 30DKAB26015-3 |
| | 284504 | Arnold Engineering | 3/9/06 | 123EC96021-11, |
| 9 | | | | 123EC96021-13 |
| | 284726 | Assoc. Machine Tech | 3/13/06 | 040349-1 |
| 10 | 285031 | Astro Spar | 3/15/06 | 65B38054-31, |
| | | | | 65B38110-4 |
| 11 | 285032 | Astro Spar | 3/15/06 | 65B38044-11 |
| | 285238 | Astro Spar | 3/17/06 | 65B38090-118, |
| 12 | | | | 65B38113-28, |
| | | | | 65B38138-2 |
| 13 | 285794 | Astro Spar | 3/23/06 | 65B38091-35 |
| | 285917 | Astro Spar | 3/24/06 | 65B38049-13 |
| 14 | 284297 | B.A.R. Engineering | 3/8/06 | L5502638-001 |
| | 284823 | BTL Machine | 3/14/06 | 724S3355-205, |
| 15 | | | | 724S3622-201 |
| | 284868 | BTL Machine | 3/14/06 | 724S3355-207 |
| 16 | 284869 | BTL Machine | 3/14/06 | 724S3309-203 |
| | 285060 | BTL Machine | 3/15/06 | 724S3309-201 |
| 17 | 285382 | BTL Machine | 3/20/06 | 724S3383-223, |
| | | | | 724S3383-225 |
| 18 | 284276 | Cad Manufacturing | 3/8/06 | 2CBH33218-2001, |
| | | | | 2CFH21307-2001, |
| 19 | | | | 2CHH33104-2001, |
| | | | | 2CHH33105-2001, |
| 20 | 284277 | Cad Manufacturing | 3/8/06 | 2CFH21503-2001 |
| | 284817 | Cad Manufacturing | 3/14/06 | CBH32062-0002 |
| 21 | 284888 | Cad Manufacturing | 3/14/06 | 2CFH21111-2001, |
| | | | | 2CFH21802-2001 |
| 22 | 284919 | Castle Industries | 3/29/06 | 4074552-11, |
| | | | | 4074552-13 |
| 23 | 285363 | Express Metal Aero | 3/20/06 | 1G02876-9 |
| | 285141 | Express Metal Aero | 3/16/06 | RX685-85L |
| 24 | 283370 | General Forming Corp | 2/24/06 | 69-42435-1 |
| | 284383 | General Forming Corp | 3/8/06 | 65-48234-19 |
| 25 | 284827 | General Forming Corp | 3/14/06 | 160D213014-R241 |
| | 285647 | General Forming Corp | 3/27/06 | 113T1842-115 |
| 26 | 285860 | General Forming Corp | 3/24/06 | 665E783P01 |
| | 283816 | Hydroform USA | 3/14/06 | 123EL50157-29 |
| 27 | 284073 | JAV Industries | 3/6/06 | B38803030-101 |
| | 285439 | JAV Industries | 3/21/06 | RD602F3716-101, |
| 28 | | | | RD602F3716-103, |

12

| | | | RD602F3716-105, |
| --- | --- | --- | --- |
| | | | RD602F3716-107, |
| | | | RD602F3717-101, |
| | | | RD602F3717-102, |
| | | | RD602F3717-103, |
| | | | RD602F3717-105 |
| 284840 | J.L. Manufacturing | 3/14/06 | 42A1012010-5001, |
| | | | 42A1013010-5002 |
| 284656 | Klune Industries | 3/10/06 | ST9M580-105 |
| 284983 | Klune Industries | 3/15/06 | 2201714-1 |
| 285750 | Klune Industries | 3/23/06 | 160D611502-5 |
| 283751 | Klune Industries | 3/1/06 | 5HK60324-101 |
| 284417 | Klune Industries | 3/8/06 | 2215888-1 |
| 284864 | Klune Industries | 3/14/06 | 2215892-1, 2215893-1 |
| 284878 | Klune Industries | 3/14/06 | 1G10802-3 |
| 285046 | Klune Industries | 3/17/06 | 4242193-1 |
| 284278 | Leonard's Metal | 3/8/06 | 688-22381-101 |
| 284936 | Leonard's Metal | 3/15/06 | 688-22381-102 |
| 285410 | Leonard's Metal | 3/21/06 | 007F2313-1P01 |
| 285553 | Leonard's Metal | 3/22/06 | 007F2211-1 |
| 285066 | M.C. Gill Corp | 3/16/06 | CC105A |
| 285094 | Molinas Sheet Metal | 3/16/06 | 17500-073-F |
| 285187 | Nu-Tech Industries | 3/17/06 | R123AMM93406-15 |
| 284318 | Pacific Contours | 3/8/06 | 114S1869-7 |
| 284647 | Precision Tube Bending | 3/10/06 | 91236-96 |
| 284719 | Precision Tube Bending | 3/13/06 | 5HJ71144-171 |
| 285807 | P T Industries | 3/23/06 | RQ535-3 |
| 285224 | Quality Aluminum Forge | 3/17/06 | 2783287-2Q |
| 285648 | Quality Forming | 3/22/06 | SERRR0067975-1A |
| 284220 | R A H Industries | 3/7/06 | 313W1804-30 |
| 284793 | R A H Industries | 3/13/06 | BACF3F005M015NN |
| 285718 | Ralph E. Ames Machine | 3/23/06 | 2710872-1-NC |
| 284876 | Ralph E. Ames Machine | 3/14/06 | 4243438-1-A |
| 284866 | Standard Metal Product | 3/14/06 | BS3520 |
| 284206 | Umpco | 3/7/06 | 9M672-1 |
| 285039 | Umpco | 3/15/06 | 9M671-1 |
| 28501 | Umpco | 3/15/06 | ST9M581-105 |
| 285500 | Umpco | 3/21/06 | ST9M580-105 |

Count One

On March 8, 2006, ACE Clearwater Enterprises ("ACE") issued purchase order 91544 to Bowman for chemical film processing per LCP-77-1006, an equivalent specification to MIL-C-5541, for part number 1211095-104.[1]

_____

[1] Lockheed Martin issued specification LCP-77-1006B, *Chemical Film Protective Treatment, Colored, Immersion, for Aluminum and Aluminum Alloys*, on August 10, 1971. The specification states, in part, "The requirements of this specification meet or exceed the

13

On March 15, 2006, Bowman delivered the processed parts and issued a COC certifying that the parts were processed in accordance with, and conformed to, the LCP-77-1006 specification.

Part number 1211095-104 was subsequently incorporated as a non-flight critical part into the S-3A Viking aircraft, a jet used by the U.S. Navy to identify, track, and destroy enemy submarines.

Count Two

On March 8, 2006, General Forming Corporation ("General Forming") issued purchase order 90378/20005 to Bowman for chemical film processing per MIL-C-5541 for multiple items bearing part number 65-48234-19.

On March 16, 2006, Bowman delivered the processed parts and issued a COC certifying that, among other things, the parts were processed in accordance with, and conformed to, the MIL-C-5541 specification.

Part number 65-48234-19 is used as a non-flight critical part on the 737 commercial aircraft manufactured by The Boeing Company ("Boeing"). Boeing is required under federal law to submit to the FAA an application for an airworthiness certificate prior to placing this aircraft in service.

Count Three

On March 9, 2006, Acromil Corporation issued purchase order P-03747 to Bowman for the application of various processes to part number 42A1011380-5003, including chemical conversion coating per MIL-C-5541E.

_____

applicable requirements of MIL-C-5541B, Class 1A."

14

1      On or about March 15, 2006, Bowman delivered the processed
2  part and issued a COC certifying that the part was processed in
3  accordance with, and conformed to, the MIL-C-5541 specification.
4      On March 16, 2006, in reliance on Bowman's certification,
5  Acromil issued to Northrop Grumman Corporation ("Northrop"), a
6  COC for a higher assembly (part number 42A1017382-1002), of which
7  parts processed by Bowman were components, certifying that, among
8  other things, the part was manufactured and inspected to
9  specified requirements.
10     Part number 42A1017382-1002 was subsequently incorporated as
11 a non-flight critical part into the X-47 Pegasus, an unmanned
12 drone manufactured by Northrop Grumman Corporation and used by
13 the U.S. Navy.
14 False Statements & Non-Disclosure of Material Information
15     Multiple agents of Bowman were aware of the requirements of
16 the ACE, General Forming, and Acromil purchase orders, Bowman's
17 Quality Instruction 520, MIL-C-5541, and the test failure
18 referenced in Anachem test report #B15348.  Despite having
19 shipped the potentially affected parts with COCs verifying
20 compliance with MIL-C-5541 while outside test analyses were
21 pending, these agents willfully determined not to notify ACE,
22 General Forming, and Acromil of the test failure.  These agents
23 of Bowman acted within the scope of their employment and with the
24 intent to benefit Bowman.
25     Had Bowman's customers promptly received notification of the
26 test failures, they would have conducted an evaluation of the
27 parts, rejected the parts, required that the parts be reprocessed
28 by Bowman, and/or notified their customers of the test failure.

15

1  Instead, as was reasonably foreseeable to Bowman, ACE, General

2  Forming, and Acromil certified the compliance of the processed

3  items to applicable specifications and sold the parts, or higher

4  assemblies into which the parts were incorporated, which were

5  then integrated into products for the end user.

6                    WAIVER OF CONSTITUTIONAL RIGHTS

7       7.   By pleading guilty, defendant gives up the following

8  rights:

9            a)   The right to persist in a plea of not guilty.

10           b)   The right to a speedy and public trial by jury.

11           c)   The right to the assistance of legal counsel at

12 trial.  (In this regard, defendant understands that, despite its

13 plea of guilty, it retains the right to be represented by counsel

14 at every other stage of the proceedings.)

15           d)   The right to be presumed innocent and to have the

16 burden of proof placed on the government to prove defendant

17 guilty beyond a reasonable doubt.

18           e)   The right to confront and cross-examine witnesses

19 against defendant.

20           f)   The right, if defendant wished, to present evidence

21 in opposition to the charges, including the right to call

22 witnesses and to subpoena those witnesses to testify.

23           g)   Any and all rights to pursue any affirmative

24 defenses, Constitutional claims, and other pretrial motions that

25 have been filed or could be filed.

26                        SENTENCING FACTORS

27      8.   Defendant understands that the Court is required to

28 consider the United States Sentencing Guidelines ("U.S.S.G." or

                              16

"Sentencing Guidelines") among other factors in determining defendant's sentence.  Defendant understands that the Sentencing Guidelines are only advisory, and that after considering the Sentencing Guidelines, the Court may be free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime of conviction.

9.   Defendant and the USAO agree and stipulate that the November 2006 edition of the Sentencing Guidelines applies and to the following applicable sentencing guideline factors:

Base Offense Level:

  + 6 [U.S.S.G. § 2B1.1]

Specific Offense Characteristic (Loss/Gain):

  + 10 [U.S.S.G. § 2B1.1(b)(1)] ($200,000>Gain>$120,000)

Specific Offense Characteristic (Victims):

  + 2 [U.S.S.G. § 2B1.1(b)(2)(A)] (>10 victims):

Base Fine:

  $350,000  [U.S.S.G. § 8C2.4(d)]

Culpability score: (5 base, +2 for >50 employees, -2 acceptance)

  6 [U.S.S.G. § 8C2.5] (5 + 2 - 1)

Fine range:

  $420,000 to $840,000 [U.S.S.G. § 8C2.7]

Probation:

  at least 1 year, not more than 5 years [U.S.S.G. § 8D1.2]

10.   The stipulations in this agreement do not bind either the United States Probation Office or the Court.  Both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating

17

to the calculation of the sentence, and (c) argue on appeal and
collateral review that the Court's sentencing guidelines
calculations are not in error, although each party agrees to
maintain its view that the calculations in paragraph 10 are
consistent with the facts of this case.

JOINT SENTENCING RECOMMENDATION

11.   The parties agree that the defendant should be
sentenced to a probationary period of three years and a fine in
the amount of $500,000 payable within 90 days of sentencing.

12.   The parties agree the restitution should not be imposed
because the non-conforming parts have been introduced into the
stream of commerce, incorporated into other assemblies, and that
the precise damage caused to the victims cannot be quantified at
this time.

DEFENDANT'S OBLIGATIONS

13.   In connection with its plea, defendant agrees that it
will:

a) Execute a resolution through its board of directors
accepting the terms of this agreement.

b) Cause an officer of the corporation to enter a plea
of guilty on behalf of the corporation as set forth in this
agreement.

c) Abide by all sentencing stipulations contained in
this agreement.

d) Cause an officer of the corporation to appear as
ordered for all court appearances, pay any ordered fines within
90 days of sentencing, and obey any other ongoing court order in
this matter.

18

e)   Pay the applicable $1200 special assessment at or before the time of sentencing.

f)   Adopt and implement a Code of Ethics ("COE") and a Corporate Compliance Program ("CCP") for defendant, acceptable to the USAO and the Probation Office.  At a minimum, the COE/CCP shall require (1) monthly external tests by an independent organization relating to processes performed by Bowman specifically identified on a schedule that is acceptable to the USAO, (2) that any non-conforming test results received from any external testing agency will be reported to all customers who have had hardware subjected to the same processes between the dates of the last acceptable external test result and the non-conforming external test result, and (3) the maintenance of adequate documentation sufficient to promptly identify the precise processes to which every test sample and customer item has been subjected and the location, date, and time as to which the processes were conducted.

g)   The Code of Ethics and Corporate Compliance Program will remain in place for a minimum of three years.  For the first six months following sentencing, defendant will employ an independent corporate monitor, acceptable to the USAO and the Probation Office, to ensure compliance pursuant to the compliance program, and the corporate monitor shall submit quarterly reports to the United States Probation Office setting forth the details of monthly monitoring reviews and noting any violations of the corporate monitoring program.  After the first six months of outside corporate monitoring, defendant may designate a non-independent corporate monitor, acceptable to the independent

19

1  monitor, to submit quarterly reports to the Probation Office for
2  the remaining term of probation.

3  THE USAO'S OBLIGATIONS

4      14.  If defendant complies fully with all defendant's
5  obligations under this agreement, the USAO agrees:

6          a)  To abide by all sentencing stipulations contained
7  in this agreement.

8          b)  Except for criminal tax violations (including
9  conspiracy to commit such violations chargeable under 18 U.S.C.
10 § 371), not to further prosecute defendant for any offense
11 arising out of defendant's conduct described in the stipulated
12 factual basis set forth in this agreement.  Defendant understands
13 that the USAO is free to prosecute defendant for any other
14 unlawful past conduct or any unlawful conduct that occurs after
15 the date of this agreement.  Defendant agrees that at the time of
16 sentencing the Court may consider the uncharged conduct in
17 determining the applicable Sentencing Guidelines range, where the
18 sentence should fall within that range, the propriety and extent
19 of any departure from that range, and the determination of the
20 sentence to be imposed after consideration of the sentencing
21 guidelines and all other relevant factors.

22         c)  The USAO has written a letter, attached as appendix
23 two, which explains the charges contained within the information,
24 the circumstances of the plea, and comments on certain factors
25 which are pertinent to suspension and debarment issues that may
26 arise with respect to the defendant's ability to contract with
27 the United States or its contractors.  The USAO agrees that
28 defendant may use that letter in connection with any suspension

20

1   or debarment proceeding provided that defendant fully complies

2   with the terms of this agreement and probation.

3   BREACH OF AGREEMENT

4      15.   If defendant, at any time between the execution of this

5   agreement and defendant's sentencing, knowingly violates or fails

6   to perform any of defendant's obligations under this agreement,

7   the USAO may declare this agreement breached.  If the USAO

8   declares this agreement breached, and the Court finds such a

9   breach to have occurred, defendant will not be able to withdraw

10   its guilty plea, and the USAO will be relieved of all of its

11   obligations under this agreement.  In particular:

12      a)   The USAO will no longer be bound by any agreements

13   concerning sentencing and will be free to seek any sentence up to

14   the statutory maximum for the crime to which defendant has

15   pleaded guilty.

16      b)   The USAO will no longer be bound by any agreements

17   regarding criminal prosecution, and will be free to prosecute

18   defendant for any crime, including charges that the USAO would

19   otherwise have been obligated not to prosecute pursuant to this

20   agreement.

21      16.  Following a knowing and willful breach of this

22   agreement by defendant, should the USAO elect to pursue any

23   charge not filed as a result of this agreement, then:

24      a)   Defendant agrees that any applicable statute of

25   limitations is tolled between the date of defendant's signing of

26   this agreement and the commencement of any such prosecution or

27   action.

28      b)   Defendant gives up all defenses based on the

21

statute of limitations, any claim of preindictment delay, or any speedy trial claim with respect to any such prosecution, except to the extent that such defenses existed as of the date of defendant's signing of this agreement.

LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

17.   Defendant gives up the right to appeal any sentence imposed by the Court, and the manner in which the sentence is determined, provided that (a) the sentence is within the statutory maximum specified above and is constitutional, (b) the Court in determining the applicable guideline range does not depart upward in offense level, and (c) the Court imposes a sentence within or below the range corresponding to the determined total fine range.   Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or a explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.

18.   The USAO gives up its right to appeal the Court's sentence, provided that (a) the Court in determining the applicable guideline range does not depart downward in offense level and (b) the Court imposes a sentence within or above the range corresponding to the determined total fine range.

22

<u>COURT NOT A PARTY</u>

19.   The Court is not a party to this agreement and need not accept any of the parties sentencing recommendations or stipulations.   Even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from any stipulation, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.   No one – not the prosecutor, defendant's attorney, or the Court – can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

20.   Except as set forth herein, there are no promises, understandings or agreements between the USAO and defendant or defendant's counsel.   Nor may any additional agreement, understanding or condition be entered into unless in a writing signed by all parties or on the record in court.

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

21.   The parties agree and stipulate that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

23

1   This agreement is effective upon signature by defendant and

2   an Assistant United States Attorney.

3   AGREED AND ACCEPTED

4

5   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA

6
    ANDRE BIROTTE, JR.
7   United States Attorney

8

9   _____          _____
    DANIEL J. O'BRIEN                         Date
10  Assistant United States Attorney

11

12

13      I have read this agreement and carefully discussed every

14  part of it with the attorney representing Bowman Plating Company,

15  Inc.  I understand the terms of this agreement, and I voluntarily

16  agree to those terms.  The attorney has advised me of rights, of

17  possible defenses, of the Sentencing Guideline provisions, and of

18  the consequences of entering into this agreement on behalf of the

19  corporation.  No promises or inducements have been made to me

20  other than those contained in this agreement.  No one has

21  threatened or forced me in any way to enter into this agreement.

22  Finally, I am satisfied with the representation of the attorney

23  in this matter.

24

25  _____          _____
    Authorized Representative of             Date
26  Defendant Bowman Plating Company, Inc.

27
        I am the attorney for defendant Bowman Plating Company, Inc.
28

                                    24

1   I have carefully discussed every part of this agreement with my

2   client.  Further, I have fully advised my client of its rights,

3   of possible defenses, of the Sentencing Guidelines' provisions,

4   and of the consequences of entering into this agreement.  To my

5   knowledge, my client's decision to enter into this agreement is

6   an informed and voluntary one.

7

8   _____          _____

    BARRY GROVEMAN                           Date
9   Counsel for
    Defendant Bowman Plating Company, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF VENTURA**

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Ventura, State of California.  My business address is 2801 Townsgate Road, Suite 200, Westlake Village, California  91361.

On May 24, 2012, I served true copies of the following document(s) described as **NOTICE OF FILING BOARD OF DIRECTORS' RESOLUTION APPROVING PLEA AGREEMENT; DECLARATION OF GREGORY J. PATTERSON IN SUPPORT THEREOF** on the interested parties in this action as follows:

> Daniel J. O'Brien, Assistant United States Attorney
> Public Corruption & Civil Rights Section
> Office of the U.S. Attorney for the Central District of California
> 312 North Spring Street
> Los Angeles, CA 90012

☒ **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Musick, Peeler & Garrett LLP's practice for collecting and processing correspondence for mailing.  On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 24, 2012, at Westlake Village, California.

Linda Puckett

794560.1

NOTICE OF FILING BOARD OF DIRECTORS' RESOLUTION APPROVING PLEA AGREEMENT;
DECLARATION OF GREGORY J. PATTERSON IN SUPPORT THEREOF